Filed 1/25/17

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| JOSE DE LA TORRE, | B268289 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS152795) |
| v. | |
| CALIFORNIA HORSE RACING BOARD, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Reversed.

Law Office of Darrell J. Vienna, Darrell J. Vienna; and Carlo Fisco for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Chris A. Knudsen, Senior Assistant Attorney General, Gary S. Balekjian, Supervising Deputy Attorney General, and Jennie M. Kelly, Deputy Attorney General, for Defendant and Respondent.

_____

Quarter horse trainer Jose De La Torre appeals from the trial court's denial of his petition for a writ of administrative mandamus, in which he challenged a license suspension and fine imposed upon him by the California Horse Racing Board (Board). The Board penalized De La Torre after finding he violated the Board's regulations by racing horses medicated with a drug that the Board had temporarily suspended from authorized use. De La Torre raises a number of contentions, including that the Board's successive temporary suspensions of the drug violated the provisions of the rule permitting temporary suspension of an authorized drug and thus exceeded the Board's authority. We agree and reverse.

## BACKGROUND

Clenbuterol, a bronchodilator, was, prior to August of 2011, a medication authorized for administration to all types of horses entered to race in California by former California Code of Regulations, title 4, section 1844, subdivision (e)(9),[1] subject to time and quantity limitations.

In April of 2011, the Board duly adopted a new regulation, section 1844.1, which provides as follows: "(a) After a public meeting that has been noticed in accordance with Government Code section 11125(a), the Board may for any cause temporarily suspend the authorized administration to a horse entered to race of any drug, substance or medication that is otherwise permitted under Rule 1844, Authorized Medication. [¶] (b) The temporary suspension of the authorized administration of a drug, substance or medication may be for a race, breed, or race meeting, provided all horses in the same race compete under the same conditions. [¶] (c) The Board shall notify in writing the racing association and the trainer's organization of any temporary suspension of authorization to administer a drug, substance or medication to a horse entered to race. The written notification shall at minimum: [¶] (1) State the authorized medication whose use is

---

[1] Undesignated regulatory references pertain to the California Code of Regulations, title 4. Although the parties refer to each regulation as a "Rule," we refer to them as sections.

2

temporarily suspended, [¶] (2) The period of time for which the use of the authorized medication is temporarily suspended, and [¶] (3) Whether the temporary suspension is for a specific breed or a race meeting. [¶] (d) A suspension of authorization to administer a drug, substance or medication to a horse entered to race shall not exceed 12 months." Section 1844.1 became effective on July 21, 2011.

On August 25, 2011, after a publicly noticed hearing, the Board temporarily suspended the use of Clenbuterol in quarter horses at Los Alamitos Race Course (Los Alamitos) for 12 months, effective October 14, 2011. On June 28, 2012, the Board suspended the use of Clenbuterol in all breeds of horses at all race tracks in California for 12 months, commencing July 18, 2012. It also extended the existing suspension for quarter horses at Los Alamitos (second suspension) through July 18, 2013. On June 20, 2013, the Board extended the suspension (third suspension) for all breeds at all tracks through July 17, 2014.

From September through November of 2013,[2] during the third suspension, four horses trained by De La Torre that raced at Los Alamitos tested positive for Clenbuterol, albeit in an amount below the maximum level of five nanograms per milliliter specified in former section 1844, subdivision (e)(9), as it then existed. On September 29, Zoomdasher finished second in a race and tested positive for Clenbuterol at 125 picograms (0.125 nanograms) per milliliter. On October 25, Carlota won a race and tested positive for Clenbuterol at 488 picograms (0.488 nanograms) per milliliter. On November 24, Walked Away and Harrisburg won in separate races. Both tested positive for Clenbuterol, with Walked Away registering 687 picograms (0.687 nanograms) per milliliter and Harrisburg having 428 picograms (0.428 nanograms) per milliliter.

On January 24, 2014, the Board filed an accusation against De La Torre based upon the four aforementioned positive Clenbuterol tests in 2013. The Board sought to revoke De La Torre's license and fine him. The Board appointed as a hearing officer Daniel Q. Schiffer, the attorney for the Pacific Coast Quarter Horse Racing Association,

---

[2] Undesignated date references pertain to 2013.

which was instrumental in the enactment of the temporary suspension of authorization for use of Clenbuterol. Schiffer denied De La Torre's motions to disqualify him and for appointment of an administrative law judge. Schiffer was the sole hearing officer at the administrative hearing conducted in May of 2014. He rejected all of De La Torre's arguments, including the one discussed in this opinion, and found that with respect to each of the four horses De La Torre trained that tested positive for Clenbuterol in 2013, De La Torre had violated section 1843, which prohibits horses racing in California from having any unauthorized substances in their bodies, and section 1887, which allows a trainer to be sanctioned if his or her horses entered in a race test positive for any prohibited substance. Schiffer recommended De La Torre's license be suspended for two years and that he be fined $100,000.

The Board rejected Schiffer's proposed decision, allowed the parties to submit briefs, and decided the matter for itself. It subsequently adopted all of Schiffer's factual findings, but amended it by incorporating by reference specified sections of its own attorney's brief and modifying the conclusion and penalty to reflect a finding that De La Torre violated sections 1843, 1844, and 1847 on four occasions in 2013, to suspend his license for three years sixty days, and to impose a fine of $160,000.

De La Torre then filed a petition for a writ of administrative mandamus in the trial court to challenge the Board's decision. He ultimately moved for judgment on his petition, raising grounds that included the issue addressed herein, i.e., that the Board illegally extended the temporary suspension of an authorized medication pursuant to section 1844.1 beyond the 12-month limit specified in section 1844.1, subdivision (d). After briefing and argument, the trial court denied De La Torre's petition and entered judgment in favor of the Board. De La Torre filed a timely appeal.

### DISCUSSION

De La Torre contends the disciplinary action against him was impermissible because the Board illegally extended the temporary suspension of an authorized medication pursuant to section 1844.1 beyond the 12-month limit specified in section

4

1844.1, subdivision (d). Because all of the violations alleged against him occurred more than 12 months after the expiration of the original suspension, he essentially argues he was not in violation of any valid regulation in force at the time. We agree.

### 1. Relevant legal principles

"An *appellate* court applies the following standards of review to a trial court's denial of a petition for a writ of administrative mandamus. First, if the trial court exercised its independent judgment, we review the record to determine whether the court's factual findings are supported by substantial evidence, resolving all evidentiary conflicts and drawing all legitimate and reasonable inferences in favor of the court's decision. [Citations.] Second, 'to the extent pure questions of law (e.g., jurisdiction) were decided at the trial court upon undisputed facts, a de novo standard will apply at the appellate level.' " (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627.)

The standard courts apply when reviewing an agency's interpretation of a statute or regulation differs from that applied when reviewing the validity of an agency's promulgation of a regulation within the scope of law-making authority delegated to the agency by the Legislature. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–12 (*Yamaha*).) "An agency interpretation of the meaning and legal effect of a statute [or regulation] is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Id.* at p. 7.) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue,

5

an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Id.* at pp. 7–8.) "Because ' "the ultimate resolution of . . . legal questions rests with the courts" ' [citation], judges play a greater role when reviewing the persuasive value of interpretive rules than they do in determining the validity of quasi-legislative rules." (*Id.* at p. 13.)

"Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's [or regulation's] legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . , that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion*, however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference." (*Yamaha*, *supra*, 19 Cal.4th at p. 11.) "Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is thus fundamentally *situational*. A court assessing the value of an interpretation must consider complex factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Id.* at p. 12.)

"[T]wo broad categories of factors relevant to a court's assessment of the weight due an agency's interpretation [are] [t]hose 'indicating that the agency has a comparative interpretive advantage over the courts,' and those 'indicating that the interpretation in question is probably correct.' " (*Yamaha*, *supra*, 19 Cal.4th at p. 12.) "In the first category are factors that 'assume the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-

ended, or entwined with issues of fact, policy, and discretion. A court is more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' [Citation.] The second group of factors . . . —those suggesting the agency's interpretation is likely to be correct—includes indications of careful consideration by senior agency officials ('an interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of deference than [one] contained in an advice letter prepared by a single staff member' [citation]), evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing' [citation] ('[a] vacillating position . . . is entitled to no deference' [citation]), and indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted." (*Yamaha*, *supra*, 19 Cal.4th at pp. 12–13.)

"Rules governing the interpretation of statutes also apply to interpretation of regulations. [Citation.] 'In interpreting regulations, the court seeks to ascertain the intent of the agency issuing the regulation by giving effect to the usual meaning of the language used so as to effectuate the purpose of the law, and by avoiding an interpretation which renders any language mere surplusage.' " (*Diablo Valley College Faculty Senate v. Contra Costa Community College Dist.* (2007) 148 Cal.App.4th 1023, 1037.) We do not construe a regulation in isolation, but instead read it with reference to the scheme of law of which it is a part, so that the whole may be harmonized and retain effectiveness. (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214.)

**2.     Section 1844.1 does not permit extension or reenactment of temporary suspensions of authorized medications**

De La Torre does not challenge the *validity* of section 1844.1, only the Board's (and trial court's) interpretation of it. We may assume, for the sake of argument, that enactment of section 1844.1 was a proper exercise of the Board's quasi-legislative powers and is a valid regulation. Those assumed facts, however, do not implicate the

7

more deferential standard of review to be applied when reviewing the *validity* of a regulation falling within the scope of an administrative agency's law-making powers.[3] The issue in this case is, instead, whether the Board correctly *interpreted* section 1844.1, subdivision (d). We review the interpretation in accordance with the principles set forth in *Yamaha*, *supra*, 19 Cal.4th at pages 11–13, and recited above.

The Board argues that nothing in section 1844.1 "prohibits the Board from issuing a subsequent 12 month suspension of a drug as the need arose so long as the public hearing requirements" were met. De La Torre argues that the 12-month limit on duration of a temporary suspension set forth in subdivision (d), in conjunction with the absence of any provision in subdivision (d) or elsewhere in section 1844.1 authorizing an extension or reenactment of a temporary suspension at the end of an existing 12-month suspension means that a temporary suspension cannot be extended or reenacted. Both parties' positions are plausible. However, viewing section 1844.1 in the context of the regulatory scheme of which it is a part and in accordance with both principles of construction and the history of its enactment, we conclude De La Torre's view is the correct one.

Section 1843, subdivision (a) prohibits horses racing in California from having any unauthorized substances in their bodies, and subdivision (b) requires any "drug substance" administered to horses entered to race in California to be "approved and authorized . . . as provided in these rules." Section 1843.1 defines "prohibited drug substance" as any substance "whose use is not expressly authorized in this article" or any authorized substance "in excess of the authorized level or other restrictions as set forth in this article." Section 1844 sets forth the list of "drug substances and medications authorized by the Board for use" in horses entered to race. At the time of De La Torre's

---

[3] "Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses *the validity of such rules*, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Yamaha*, *supra*, 19 Cal.4th at pp. 10–11, italics added.)

alleged violations, Clenbuterol was listed in section 1844, subdivision (e)(9) as authorized for administration to all types of horses entered to race in California, subject only to time and quantity limitations.

Section 1844.1 repeatedly refers to the temporary nature of any suspension imposed pursuant thereto. The words "temporary" and "temporarily" are used in each subdivision and subpart of each subdivision except subdivision (d). Subdivision (d) sets forth the maximum duration of such a temporary suspension: "A suspension of authorization to administer a drug, substance or medication to a horse entered to race shall not exceed 12 months." Although the regulation does not expressly prohibit extensions or reenactments of a particular temporary suspension, its frequent references to the temporary nature of any suspension, its inclusion of a specific maximum duration of any such temporary suspension, and the regulatory scheme in which authorized substances and quantities are listed in section 1844 support De La Torre's view that a section 1844.1 temporary suspension of authorization for use of an otherwise authorized substance was not intended to be made long-term or permanent through extensions or immediate reenactments. Inclusion of a 12-month time limit otherwise serves no purpose—apart from creating more work for the Board—if section 1844.1 was intended to permit a temporary suspension to be extended or reenacted. Moreover, a repeatedly reenacted or extended suspension, such as that of Clenbuterol shown in this case, can hardly be called a "temporary" one.

In its brief on appeal, the Board argued that "[t]here is no limit in the rule as to how many temporary suspensions can be imposed." At oral argument, the Board revised its position, conceding that repeated suspensions might at some point violate the rule by converting a temporary suspension into a quasi-permanent suspension.

This concession illustrates the difficulty with the Board's interpretation of the twelve month limitation in subdivision (d). That interpretation is based on the "plain language" of the rule, which the Board argues does not prohibit "subsequent 12 month suspensions after an initial suspension." But there is also no language in the rule

9

permitting some, but not too many, successive suspensions. And, as the Board's concession recognizes, the rule is intended to permit only a temporary suspension. Thus, the most reasonable interpretation of the rule's language is that a "temporary" suspension is defined by the only time limit that actually appears in the rule, i.e., the twelve month limit in subdivision (d).[4]

The regulatory history of section 1844.1 also supports De La Torre's view. In response to pre-enactment comments from interested groups and individuals, the Board not only emphasized the one-year maximum duration of any temporary suspension, it also declared that it would act in accordance with the Administrative Procedure Act to amend section 1844 if, during the temporary suspension, it concluded a substance should no longer be authorized for use. For instance, in responses to comments by Dr. Don Shields, the California Thoroughbred Trainers group, and the Thoroughbred Owners of California group, the Board repeatedly defended section 1844.1 by distinguishing it from the authority the Board already possessed under section 1406, which allows the Board to suspend any of its rules, with or without a hearing and with no time limitation on such

---

[4] At oral argument, the Board also suggested that the repeated suspensions at issue in this case do not violate the 12-month time limit because they were *different* suspensions and not extensions of the same suspension. There are several reasons why we do not find this persuasive. First, each suspension concerned the same drug—Clenbuterol. Section 1844.1 focuses on the suspension of a particular "drug, substance or medication." (§ 1844.1, subd. (a).) Indeed, the Board argues that the purpose of the section was to "monitor and study the effects of a temporary suspension of a particular medication to determine whether it should be permanently suspended or whether it can be authorized in smaller quantities without mischievous results." Second, although the second and third suspensions at issue here were broader than the first, they all included the category of horses that affected De La Torre, i.e., quarter horses racing at Los Alamitos. As to that category, the subsequent suspensions were in fact merely extensions of a ban that was already in place. Third, the second and third suspensions were identical in scope, and the alleged violations at issue in this appeal all occurred during the third suspension. Thus, even if one accepted the proposition that section 1844.1 permits successive *non-identical* suspensions (which we do not), that would not affect the outcome of this appeal, as the third suspension would be invalid here even under that interpretation.

10

suspension. The Board noted that section 1844.1 would constrain its existing authority, not only because the Board could act without a hearing under section 1406, but also because section 1844.1 only allowed the Board to "temporarily suspend the use of an authorized medication . . . for a limited amount of time (up to one year)"; "the term of suspension is limited to one year"; and section 1844.1 "restricts any temporary suspension to *not more than one year*" and "limits the duration of any temporary suspension to *not longer than one year*." (Italics added.)

In response to another comment in which Dr. Shields suggested that proposed section 1844.1 should be revised to allow only a maximum duration of six months for a temporary suspension because 12 months was " 'too onerous a burden,' " the Board also elaborated upon the duration of a temporary suspension: "Subsection 1844.1(d) states a suspension of an authorized medication shall not exceed 12 months. This means the suspension of an authorized medication can be for as short a time as within 24 hours of the race in which the horse is entered until post race . . . or for as much as one year."

In response to a comment by the California Thoroughbred Trainers group expressly acknowledging that suspension of " 'the normal rulemaking process' " might be required " 'in isolated or emergency situations,' " the Board stated: "The proposed addition of Rule 1844.1 is not an attempt to suspend the normal rulemaking process. Rule 1844.1 will allow the Board to temporarily suspend the use of an authorized medication or drug substance. *If, during the temporary suspension, the Board determines that it must amend Rule 1844, it will engage in rulemaking process according to the California Administrative Procedures Act.*" (Italics added.) The California Thoroughbred Trainers further commented: " 'As currently written, any suspension of authorization under the proposed rule shall not exceed 12 months. However, *there is no safeguard against renewals of the "temporary" authorization.* Presumably, the current rule is written to provide for a rulemaking process to enable a permanent rule to be enacted, or modification of an existing rule, in the 12-month period. However, *additional language should be prepared to disable any attempt to evade the existing rulemaking*

11

*process.' "* (Italics added.)  The Board responded:  "This comment assumes that every temporary suspension of an authorized medication will last twelve months.  Subsection 1844.1(b) provides that a temporary suspension may be for a race, breed, or race meeting provided all horses in the same race compete under the same conditions.  The quarter horse meeting at Los Alamitos is the only race meeting that lasts twelve months.  Other meetings may last for as long as six months or as short as one week.  If the Board were to determine it wished to amend Rule 1844, that would be a separate action made in accordance with the California Administrative Procedure Act."

In response to a comment by the Thoroughbred Owners of California group questioning " 'the need for such an overreaching rule,' " the Board represented as follows:  "The temporary suspension need not be global; instead, it can be for a single race, a breed or a race meeting, and it may be for a period of time that ranges from a couple of days to one year."  In response to another comment by the Thoroughbred Owners of California requesting that the Board " 'rewrite rule 1844.1 to narrow the scope of what it desires to achieve, while instilling the proper parameters and guidelines,' " the Board responded, in part, "*Any decision by the Board to temporarily suspend an authorized medication is limited to no more than one year*."  (Italics added.)

In addition, in its Statement of Reasons for adoption of section 1844.1, the Board represented to the Office of Administrative Law (OAL) that "Subsection 1844.1(d) states the temporary suspension of authorization to administer a medication shall not exceed 12 months.  *This provides the Board with enough time to determine the effect of the temporary suspension, and amend its medication regulations, if necessary.  In addition, this sets boundaries so that those affected will know when the temporary suspension will end.*"  (Italics added.)

The Board's representations to the OAL and to interested parties who commented on the proposed adoption of section 1844.1 thus demonstrate that the Board intended that any temporary suspension under section 1844.1 would last "no more than one year" and that during the one-year (maximum) duration of the temporary suspension the Board

12

would decide whether to amend section 1844 to exclude or limit the use of a substance listed therein. This is exactly what the Board ultimately did in 2015 with respect to Clenbuterol, prohibiting its use in quarter horses but allowing it to be used in other horses up to a specified limit.

We now address the appropriate level of deference to afford to the Board's interpretation of section 1844.1. Nothing pertaining to section 1844.1 provides the Board with a comparative interpretive advantage over the courts. Determining whether the regulation permits renewed or reenacted temporary suspensions requires no expertise or technical knowledge. The regulation is not technical, obscure, complex, open-ended, or entwined with issues of fact, policy, or discretion. Although issues of fact or policy necessarily motivate the Board to temporarily suspend authorized use of a substance, these fact and policy matters have nothing to do with the interpretation of the regulation itself.

With respect to the second category—factors indicating that the interpretation in question is probably correct—the record does not support the Board's more recent interpretation. The portions of the rule-making file quoted above establish that when the Board proposed and adopted section 1844.1, it assured interested parties and the OAL that any temporary suspension under section 1844.1 would not last longer than 12 months, and that the Board would amend section 1844 within the 12-month temporary suspension period if it decided that the temporary suspension had been beneficial. The Board's subsequent interpretation that temporary suspensions under section 1844.1 may be extended or reenacted is completely different and therefore has not been consistently maintained, was not contemporaneous with the adoption of section 1844.1, and was not the result of careful consideration by senior agency officials. Although the Board extended or reenacted the Clenbuterol suspension less than one year after the effective date of section 1844.1, this indicates, at most, that the Board changed its views from those presented to commenting parties and the OAL before this litigation arose. It does not, however, negate the import of this change of interpretation.

13

The Board argues that it was merely wrong about 12 months being an adequate time to study the Clenbuterol problem. That may be true, but it is irrelevant. Section 1844.1 is of general application and both the text and regulatory history clearly reveal that temporary suspensions are not to exceed 12 months. If the Board was mistaken about 12 months being sufficient to make a decision and amend section 1844, then it should have amended section 1844.1. Such a mistake does not, however, justify disregarding the terms of section 1844.1.

Accordingly, the Board's interpretation of section 1844.1 at the time it extended or reenacted the Clenbuterol ban and in the instant litigation is not entitled to deference because the Board has vacillated. (*Yamaha*, *supra*, 19 Cal.4th at p. 13.) After considering the text of section 1844.1 and its regulatory history, we conclude that a temporary suspension of authorized use of a particular substance under section 1844.1 may not be extended beyond 12 months through reenactment or extension of the temporary suspension. Therefore, the 2012 and 2013 extensions or reenactments of the suspension of use of Clenbuterol in quarter horses at Los Alamitos were invalid. The allegations against and findings of regulatory violations by De La Torre had no legal basis, and the penalties imposed upon him were equally invalid.[5]

---

[5] Because we interpret section 1844.1, subdivision (d) to prohibit extensions or reenactments of a suspension of the authorized use of a particular substance beyond 12 months, we need not consider De La Torre's argument that the Board's orders authorizing the second and third suspensions were improper "underground regulations." The second and third suspensions violated the Board's own regulation. They were therefore without legal effect and could not provide the basis for an alleged regulatory violation by De La Torre.

## DISPOSITION

The judgment is reversed.  Appellant is awarded his costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, J.

I concur:


CHANEY, J.

ROTHSCHILD, P. J., concurring:

In June 2012, the California Horse Racing Board (Board) ordered a statewide, 12-month suspension of Clenbuterol (the 2012 suspension). The following year, in June 2013, the Board extended the statewide suspension of Clenbuterol for an additional 12 months (the 2013 suspension). De la Torre's alleged violations occurred entirely within the term of the 2013 suspension.

I agree with my colleagues that California Code of Regulations, title 4, section 1844.1 prohibits, through reenactments or extensions, the suspension of a particular substance for more than 12 months. The 2013 suspension of Clenbuterol, which extended its 2012 suspension beyond 12 months, was therefore invalid. Because the Board's authority to discipline De la Torre depended upon the validity of the 2013 suspension, the Board's decision must be reversed. I therefore concur in the majority's disposition in this case.

Because the Board's discipline of De la Torre must be reversed based on the invalidity of the 2013 suspension, we need not decide whether the 2012 suspension was invalid. The majority opinion nevertheless states that the 2012 suspension, as well as the 2013 suspension, is invalid. (Maj. opn. *ante*, at p. 14.) Because I would prefer not to decide that issue in dicta, but leave it for another day, I decline to join in the majority opinion. (See, e.g., *Young v. Three for One Oil Royalties* (1934) 1 Cal.2d 639, 647-648; *Estrada v. RPS, Inc.* (2005) 125 Cal.App.4th 976, 987 (conc. opn. of Mallano, J.).)

ROTHSCHILD, P. J.